**IOWA SUPREME COURT BOARD OF PROFESSIONAL ETHICS AND CONDUCT, Complainant,**

v.

**N. Michael D'ANGELO, Respondent.**

**No. 00–0920.**

Supreme Court of Iowa.

Nov. 16, 2000.

---

* Senior judge assigned by order pursuant to     Iowa Code section 602.9206 (1999).

Norman G. Bastemeyer and Charles L. Harrington, Des Moines, for complainant.

N. Michael D'Angelo, Oakland, pro se, for respondent.

NEUMAN, Justice.

A division of the Grievance Commission found that respondent, attorney N. Michael D'Angelo, violated at least seven provisions of the Iowa Code of Professional Responsibility for Lawyers in connection with the probate of five estates for which he was the designated attorney. The violations generally involve neglect, collecting fees before court authorization, improper trust accounting, misappropriating client funds, disregarding court orders, and failing to respond to inquiries by the Board of Professional Ethics and Conduct (Board). The Commission recommends that we suspend D'Angelo's license for not less than six months.

The matter is now before us in accordance with Iowa Supreme Court Rule 118.10. D'Angelo has filed no appeal but the Board has filed a statement urging us to consider a harsher penalty. Given the nature and number of ethical violations revealed by the record, we agree that a more serious penalty is warranted.

## I. Background Facts.

D'Angelo is a sole practitioner from Oakland, Iowa. He was admitted to practice in 1971. This is not his first brush with the lawyer disciplinary system. In 1988 we admonished him for taking probate fees prematurely. He received a reprimand in 1996 for securing a judge's signature on an order that varied from a draft agreed upon by opposing counsel. Although he is described as personable and well-liked by his colleagues, he is also known as a lawyer who procrastinates and fails to get things done. Regrettably, the five probate matters before us substantiate that negative reputation.

*Virginia Ford Estate.* Ford's four children, acting as co-executors, hired D'Angelo to probate their mother's estate when she died in February 1995. D'Angelo had represented Virginia and her husband when they set up a family farm corporation some years earlier and divided the shares among the family members. He nevertheless included the entire value of the corporation in Virginia's estate. The children, certain Virginia held only a minority interest, hired counsel at their own expense who convinced D'Angelo to prepare a revised inventory. Thereafter D'Angelo filed the federal estate tax return late, resulting in a $1500 penalty which he eventually paid.

A year later the IRS contacted one of the executors about the return, unable to get any response to requests for information from D'Angelo. The co–executor, Joan Shanno, was likewise unable to secure a response from him. She contacted a Council Bluffs lawyer, Frank Pechacek, who—after several unsuccessful tries—eventually obtained the necessary information from D'Angelo to satisfy the IRS and conclude the audit.

Pechacek was ultimately hired by the heirs to close the estate. In doing so he discovered that D'Angelo had been paid $8590 for fees and costs in November 1995. The probate court set the matter of fees for hearing, ordering D'Angelo to file an itemized breakdown of his service to the estate and costs incurred. He failed to file the itemization. The court subtracted Pechacek's fees from the amount already paid, and ordered D'Angelo to reimburse him within fifteen days. D'Angelo missed that deadline but eventually paid Pechacek with a check drawn, not on his trust account, but from his operating account.

Before the estate could be closed, co–executor Shanno was forced to pay delinquent court costs that D'Angelo had assured her would be covered by the $8590 paid at the outset. D'Angelo reimbursed her for those costs only after she filed a complaint with the Board in October 1998.

***Dorothy Green Estate.*** Marline Bryant, daughter of D'Angelo's longtime client, Dorothy Green, hired D'Angelo to probate her mother's estate. Another daughter, Patricia Johnston, hired Pechacek to help get information about the estate that she was unable to secure from Bryant or D'Angelo. Pechacek determined that D'Angelo had not timely filed the probate inventory. The record revealed that approximately one month after the probate inventory *was* filed, D'Angelo secured a court order to pay full fees to himself and Bryant totaling $11,294. Pechacek also learned that Bryant, without notice to Johnston, had sold herself farm equip-

ment, valued in the estate at $13,000, for roughly $2600.

Based on these and other irregularities, Pechacek sought Bryant's removal and the appointment of Firstar Bank as successor executor. The order appointing the successor, as amended in June 1998, required Bryant and D'Angelo to immediately pay the Green Estate the fees received prematurely, plus interest from October 28, 1995. The court also ordered D'Angelo to pay $1075 in court costs that had been advanced to him but not applied to the costs. The payments were not forthcoming and a show cause hearing was scheduled. D'Angelo satisfied the court order just days before the contempt hearing.

After Pechacek took over as attorney for the estate, he discovered no fiduciary income taxes had been filed, resulting in a substantial overpayment of taxes by the beneficiaries. Neither had an inheritance tax clearance been secured. Pechacek ultimately resolved these matters. The hearing on the closing of the estate was pending at the time of D'Angelo's disciplinary hearing.

***Earl Smith Estate.*** Verla Mohn was the executor for the estate of Earl Smith, and D'Angelo was the estate's attorney. An October 1999 audit of D'Angelo's trust account by the Client Security and Attorney Disciplinary Commission revealed a check written by Mohn for $16,992 that was deposited in D'Angelo's office operating account. Within a month the funds had been withdrawn. Upon inquiry D'Angelo acknowledged that the check represented inheritance taxes totaling $11,104 plus $5808 for projected fees. D'Angelo admitted that the check should have been deposited in his trust account and that the fees were taken before they were earned or any court authorization had been obtained. He took them, he explained, because the executor was terminally ill and eager to wrap up her responsibilities for the estate. He had no explanation for why the funds were not deposited in his trust account.

In the final report filed in the Smith Estate, D'Angelo misrepresented to the court that an accounting had been waived, when it had not, and that all statutory tax obligations had been complied with. D'Angelo eventually repaid the entire $16,992 to the Smith Estate and declined any fees for work allegedly performed.

***Verla Mohn Estate.*** When Verla Mohn died her son, Daniel, was appointed the estate's executor. Mohn's will was admitted to probate in May 1996. The client security commission auditor inquired about a January 1997 deposit in D'Angelo's operating account for $8003 in estate legal fees. D'Angelo explained that Daniel Mohn wrote the check and left it in D'Angelo's office while he was out. He thought the fee had been approved by the court, although he could produce no order saying so, and he acknowledged that the funds were deposited directly into his operating account rather than a trust account. Another check received by D'Angelo from Mohn, in the sum of $3500, was never cashed because D'Angelo did not know what it was for. It was found in the file at a later date when the matter was transferred to another attorney for completion.

As with the Smith estate, D'Angelo returned all fees to the Mohn estate when his trust account violations came to light. He has subsequently sought no fees for work done on the estate.

***Jeanette Calmer Estate.*** Jeanette Calmer died in March 1996 leaving a probate estate consisting solely of a modest checking account. The Pottawattamie clerk of court issued delinquency notices to the co-executors in November 1996, May 1998, and November 1998, for failure to file a probate inventory and interlocutory reports. One of the co-executors, Kaye Risden, repeatedly called D'Angelo about the status of the estate. Her calls were not returned. Eventually Risden told D'Angelo's staff that she would pick up the file and conclude the probate herself. D'Angelo contacted her and told her that would

not be necessary as the estate had been finalized.

The probate file revealed a final report signed by another co-executor, but not by Risden. Nor had Risden received notice of D'Angelo's claim for attorney's fees, or a copy of D'Angelo's motion to extend the date for closing the estate. D'Angelo acknowledged that the final report was incomplete and should not have been in the court file. At the time of the disciplinary hearing in June 2000, the ninety-day extension had expired and the estate had not yet been closed.

## II. Disciplinary Proceedings.

The Board's complaint, as amended in five counts, charged D'Angelo with the following violations of the Iowa Code of Professional Responsibility for Lawyers: DR 1–102(A)(3), (4), (5), (6) (engaging in illegal conduct involving moral turpitude, dishonesty or misrepresentation prejudicial to the administration of justice or that reflects adversely on fitness to practice law); DR 2–106(A) (collecting illegal fees); DR 6–101(A) (neglect and/or incompetence in matters entrusted to the lawyer); DR 7–106(A) (disregarding court order); and DR 9–102(A) (failure to keep client's funds in a trust account).

D'Angelo filed no response to the complaint, nor did he answer interrogatories or the Board's multiple requests for admissions. The Board filed a motion to compel discovery, which was likewise ignored by D'Angelo, followed by a motion for sanctions. D'Angelo's utter lack of cooperation prompted the Commission to prohibit him from calling witnesses or tendering exhibits at the hearing. He did, however, appear at the hearing and testify in his own behalf.

Due to D'Angelo's failure to admit or deny any of the allegations of the Board's complaint or respond to any of the requests for admissions, the Commission accepted the truth of all allegations and deemed all requests admitted. It found that D'Angelo plainly neglected work en-

trusted to him and failed to communicate effectively with his clients, all in violation of DR 6–101(A). With respect to DR 1–102, the Commission found no proof that D'Angelo charged excessive fees or that he was intentionally dishonest with regard to the matter of fees. It determined, however, that his failure to obtain prior court approval before taking probate fees and his failure to deposit fees not yet earned in a client trust account reflected adversely on his fitness to practice law. It likewise concluded his failure to act in response to a court order until confronted with a citation for contempt violated DR 7–106(A). The Commission expressed its belief that none of D'Angelo's misconduct involved moral turpitude.

## III. Scope of Review.

■ Our review of lawyer disciplinary cases is de novo. Ct. R. 118.10; *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Leon,* 602 N.W.2d 336, 336 (Iowa 1999); *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Gordon Winkel,* 542 N.W.2d 252, 254 (Iowa 1996). We are grateful for the work performed by the lawyers and laypersons who serve on the Grievance Commission. We give respectful consideration to their findings and recommendations but, under well-established rules, we are not bound by them. *Gordon Winkel,* 542 N.W.2d at 254. We are obliged to make an independent determination of the appropriate sanction based on the unique facts of each case. *Leon,* 602 N.W.2d at 336.

■ The burden rests upon the Board to prove the unethical conduct alleged in its complaint by a convincing preponderance of the evidence. *Gordon Winkel,* 542 N.W.2d at 254. This does not require proof beyond a reasonable doubt but does require more than the preponderance standard applied in an ordinary civil case. *Id.* Here the Board was entitled to rely on matters urged in requests for admissions because D'Angelo failed to deny or otherwise object to them. *See id.*

## IV. Ethical Violations at Issue.

■ *Probate fees and costs.* Iowa law prohibits an attorney from accepting fees for probate work prior to obtaining a court order authorizing such fees. *See* Iowa Code §§ 633.197, .198 (1997) (authorizing payment of "reasonable fees as may be determined by the court"). Iowa Rule of Probate Procedure 2(d) permits payment of one–half of the authorized fees when federal and Iowa estate tax returns are prepared or an inheritance tax clearance is filed, with the remainder payable upon filing of the final report and payment of costs. We have repeatedly held that taking unauthorized fees and taking fees in advance of earning them is illegal and violates DR 2–106(A). *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Fleming,* 602 N.W.2d 340, 342 (Iowa 1999); *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Smith,* 569 N.W.2d 499, 500 (Iowa 1997). Moreover, all client funds (including costs) paid to an attorney must be deposited into an interest-bearing trust account, rather than the firm's operating account, until they are earned. *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Herrera,* 560 N.W.2d 592, 594 (Iowa 1997). Failure to do so violates DR 9–102(A). *Id.*

D'Angelo admitted, both through his failure to deny the Board's request for admissions as well as by his testimony before the Commission, that he accepted fees prior to court authorization in the Ford, Green, Smith and Mohn estates. He also admitted that he took fees in advance of earning them when he deposited executors' checks in his operating account immediately upon receiving them. He failed to deposit checks advanced for costs into an interest-bearing trust account. D'Angelo's violations of DR 2–106(A) and DR 9–102(A) are clearly established by this record.

*Neglect and dishonesty concerning client matters.* Abundant evidence in the record establishes that D'Angelo negli-

gently handled the estates for which he was the attorney. He failed to timely file the estate tax return in the Ford estate and repeatedly failed to furnish the IRS information necessary to conclude its audit. His inaction prompted the co–executors to seek alternate counsel to close the estate. D'Angelo's general neglect and lack of communication with the co–executors is also demonstrated in the Calmer Estate. His inaction led to repeated delinquency notices and failure to file the probate inventory and other required reports. He advised a co-executor that these matters were concluded when, in fact, the estate remained open and D'Angelo sought court approval of his fees without notice to the executor. These events plainly establish that D'Angelo engaged in a pattern of neglect and dishonesty in dealing with his clients in violation of DR 6–101(A)(3) and DR 1–102(A)(4).

**Disregarding a court order.** Judge Gordon Abel ordered D'Angelo to pay the Ford Estate's new attorney, Frank Pechacek, $4043.87 out of the $8590 paid to D'Angelo by the co-executors. Although the order directed that reimbursement be made within fifteen days, D'Angelo did not satisfy his obligation for a month—from a check drawn on his operating account rather than his trust account. Some months later, Judge Abel ordered D'Angelo to reimburse the Green Estate $5647 plus interest for fees prematurely taken and $1075 for court costs advanced but never paid to the clerk of court. Although the order called for payment within ten days, payment was made only upon threat of contempt some two months later. Plainly D'Angelo violated DR 7–106(A) when he disregarded these court orders.

**Fitness to practice law/moral turpitude.** The Board's remaining allegations concern DR 1–102(3), (5), and (6), relating to illegal conduct involving moral turpitude, conduct prejudicial to the administration of justice, and conduct reflecting adversely on a lawyer's fitness to practice law. Addressing the latter disciplinary

rules first, it is apparent from this record that D'Angelo habitually disregards statutes and court rules designed to protect the public interest. His tendency to procrastinate has resulted in losses to his clients of both time and expense. His utter disregard for rules pertaining to the disciplinary process shows disrespect for his professional colleagues and the administration of justice in this state, in violation of DR 1–102(5) and (6).

Turning to DR 1–102(3), the record plainly reveals conduct by D'Angelo contrary to statutes. The question remains whether his illegal conduct involves moral turpitude. The Commission found that it did not. We are inclined to agree. We have said that moral turpitude in the context of lawyer discipline "connotes behavior involving 'fraudulent or dishonest intent.'" *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Romeo,* 554 N.W.2d 552, 554 (Iowa 1996) (citation omitted). It is plainly established when certain violations of the criminal law occur. *See, e.g., Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Lyzenga,* 619 N.W.2d 327, 330 (Iowa 2000) (lawyer's conviction for prostitution involves moral turpitude.) Here the record reveals more inattention and disregard for probate statutes and the best interest of his clients than intentionally dishonest behavior. Although D'Angelo's conduct may not involve moral turpitude, his ethical lapses are serious and subject him to strict sanctions, a matter to which we now turn.

## V. Sanction.

When fixing an appropriate sanction for ethical misconduct, this court considers "the nature of the violations, protection of the public, deterrence of similar misconduct by others, the lawyer's fitness to practice, and [the court's] duty to uphold the integrity of the profession in the eyes of the public." *Fleming,* 602 N.W.2d at 342. Although the inconvenience suffered by D'Angelo's clients due to his neglect and delay are important consider-

ations, we are particularly concerned whenever a disciplinary proceeding involves commingling or misappropriation of client funds. A deliberate conversion of client funds ordinarily demands revocation of the lawyer's license. *See, e.g., Leon,* 602 N.W.2d at 338 (repeated misappropriation of trust funds to cover-up neglect in several clients' cases warranted revocation); *Committee on Prof'l Ethics & Conduct v. Ottesen,* 525 N.W.2d 865, 866 (Iowa 1994) (revocation imposed where routine audit revealed attorney's conversion of $7000 in client trust funds to his own use); *Committee on Prof'l Ethics & Conduct v. Tullar,* 466 N.W.2d 912, 913–14 (Iowa 1991) (lawyer convicted of first-degree theft for converting over $37,000 in estate funds to his own use). We have on occasion, however, imposed a lesser penalty when the commingling appeared negligent, rather than intentional, the funds were not knowingly converted to the lawyer's own use, no client suffered financial loss, or other unique facts mitigated in favor of leniency. *See, e.g., Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Allen,* 586 N.W.2d 383, 390 (Iowa 1998) (although lawyer converted aunt's conservatorship funds to own use and took fees without prior court approval, lawyer's candid accounting and unique relationship to ward and only other beneficiary justified one-year suspension rather than revocation); *Herrera,* 560 N.W.2d at 595 (despite proof of trust account violations, lawyer's honesty, forthright response, and move to correct mismanaged accounting operation supported Commission's recommendation of reprimand instead of suspension); *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Gottschalk,* 553 N.W.2d 322, 324–25 (Iowa 1996) (one-year recommended suspension for trust account violations upheld where infractions inconsistent with prior history, no client suffered damage, and lawyer cooperated fully in investigation); *Committee on Prof'l Ethics & Conduct v. Harris,* 524 N.W.2d 179, 181 (Iowa 1994) (recommended one-month suspension increased to three years, but not revocation, based on serious but isolated incident of trust account violation where client suffered no loss and fees fairly earned).

■ The Commission recommended a six-month suspension here, fearful that D'Angelo's sloppy office practices might continue to pose a risk for monetary losses but convinced his conduct was not fundamentally dishonest. The Board urges us to view D'Angelo's conduct with greater cynicism. Having reviewed the transcript of the hearing, however, we are inclined to concur in the Commission's belief that D'Angelo's misconduct stems from inattention and neglect that snowballed and, combined with serious but unspecified health problems, led him to disregard fundamental rules of practice and ethics. This behavior will not be countenanced but we think it may be distinguished from misconduct warranting revocation. It nevertheless demands a lengthy suspension. This is particularly true given D'Angelo's prior reprimand, the sheer number of ethical breaches identified, and D'Angelo's failure to cooperate in any measure with disciplinary officials.

We therefore suspend N. Michael D'Angelo's license to practice law in this state indefinitely with no possibility of reinstatement for three years. This suspension shall apply to all facets of the practice of law. *See* Ct. R. 118.12. Upon application for reinstatement, D'Angelo shall furnish proof that he has complied with the notification and disengagement requirements of rules 118.13 and 118.18. Costs are assessed to the respondent.

**LICENSE SUSPENDED.**

McGIVERIN, S.J.*, participates in place of LARSON, J., who takes no part.

---

* Senior judge assigned by order pursuant to

Iowa Code section 602.9206 (1999).