IN THE SUPREME COURT OF IOWA

 No. 03 / 05-1589

 Filed February 24, 2006

IOWA SUPREME COURT ATTORNEY
DISCIPLINARY BOARD,

 Complainant,

vs.

N. MICHAEL D’ANGELO,

 Respondent.

________________________________________________________________________
 On review of the report of the Grievance Commission.

 The Iowa Supreme Court Attorney Disciplinary Board filed a complaint
against the respondent, N. Michael D’Angelo, identifying multiple
allegations of misconduct, some of which occurred before, and some
occurring after, D’Angelo’s license was first suspended. License Revoked.

 Michael J. Carroll of Babich, Goldman, Cashatt and Renzo, P.C., Des
Moines, and Roger J. Kuhle of Law Office of Roger J. Kuhle, Indianola, for
respondent.

 Charles L. Harrington and Teresa A. Vens, Des Moines, for
complainant.

STREIT, Justice.
 The Iowa Supreme Court Attorney Disciplinary Board (“Board”) filed a
complaint against the respondent, N. Michael D’Angelo, alleging he had
violated several provisions of the Iowa Code of Professional Responsibility
by misappropriating client funds, neglecting client matters, mishandling
his trust account, making misrepresentations, and failing to respond to
inquiries from the Board. The Grievance Commission found the Board proved
the alleged violations and recommended we revoke D’Angelo’s license to
practice law.
 We find the Board proved these ethical violations. Based on the
seriousness and number of violations, we believe a revocation is warranted.
 I.  Background Facts
 D’Angelo is a sole practitioner in Oakland, Iowa who was admitted to
practice law in 1971. D’Angelo has received numerous sanctions for
previous ethical violations.
 On November 15, 1996, he was publicly reprimanded for conduct
involving dishonesty, fraud, deceit or misrepresentation, conduct
prejudicial to the administration of justice, and conduct reflecting
adversely on his fitness to practice law for drafting a dissolution decree
that varied from the parties’ stipulation and obtaining a judge’s signature
thereon.
 On November 16, 2000, we suspended his law license indefinitely, with
no possibility of reinstatement for three years, for accepting fees for
probate work prior to obtaining a court order authorizing the fees,
depositing client funds into his operating account, displaying general
neglect and lack of communication with his clients, complying with a court
order only upon threat of contempt, and disregarding rules pertaining to
the disciplinary process. Iowa Supreme Ct. Bd. of Prof’l Ethics & Conduct
v. D’Angelo, 619 N.W.2d 333, 337-39 (Iowa 2000) (hereinafter “D’Angelo I”).
 On October 22, 2002, D’Angelo was again before this court for newly
discovered violations which occurred both before and after his 2000
suspension. Iowa Supreme Ct. Bd. of Prof’l Ethics & Conduct v. D’Angelo,
652 N.W.2d 213, 215-16 (Iowa 2002) (hereinafter “D’Angelo II”). The
violations which occurred prior to his first suspension consisted of client
neglect and collection of fees without court authorization. Id. at 215.
The violations which occurred after his first suspension consisted of
failing to cooperate with the board concerning the new charges against him
and failing to comply with the previous suspension order by not refunding
unearned fees to his clients. Id. We suspended D’Angelo for one year and
prohibited him from handling probate matters unless he associated himself
with a competent probate lawyer. Id. at 215-16. Because most of these
violations were part of the same pattern of conduct that led to his
previous suspension in 2000, we ran the suspensions concurrently. Id.
D’Angelo’s suspensions ended in November of 2003, but he has not yet
applied for reinstatement.
 Remarkably, D’Angelo is here before us again for violations which
occurred both before and after his 2000 suspension.
 II.  Standard of Review
 We review attorney disciplinary proceedings de novo. Iowa Supreme Ct.
Attorney Disciplinary Bd. v. Kadenge, 706 N.W.2d 403, 405 (Iowa 2005); Iowa
Ct. R. 35.10(1). We give respectful consideration to the Commission’s
findings and recommendations, but are not bound by them. See Iowa Supreme
Ct. Bd. of Prof’l Ethics & Conduct v. Bell, 650 N.W.2d 648, 650 (Iowa 2002)
(revoking license even though Commission recommended five-year suspension).
 The Board must prove attorney misconduct by a convincing preponderance of
the evidence. Kadenge, 706 N.W.2d at 406. This burden is “less than proof
beyond a reasonable doubt, but more than the preponderance standard
required in the usual civil case.” Iowa Supreme Ct. Bd. of Prof’l Ethics &
Conduct v. Lett, 674 N.W.2d 139, 142 (Iowa 2004).
 III.  Factual Findings
 D’Angelo refutes many of the Board’s allegations and pits his own
testimony, the testimony of his wife, and the testimony of his secretary
against the evidence offered by the Board. It is not our custom to attempt
to set out the evidence in detail and try to harmonize the testimony of
opposing witnesses in our opinions. Benton County Sav. Bank v. First Nat’l
Bank, 179 Iowa 993, 996, 162 N.W. 204, 205 (1917). The Commission
considered the testimony and evidence from his former clients more
credible, and after our de novo review of the record, we do not disturb the
Commission’s credibility findings. Based upon D’Angelo’s admissions and
the evidence presented to the Commission concerning the various ethical
violations, we find the Board proved the following by a convincing
preponderance of the evidence.
 A.  O’Rourke Matter
 D’Angelo met with Beverly O’Rourke on December 15, 2000, a full month
after his license to practice law had been suspended. O’Rourke retained
D’Angelo to handle her bankruptcy proceeding and gave him a check for a
$450 retainer. When O’Rourke asked how to spell “D’Angelo,” he told her to
just leave the “payable to” line blank. D’Angelo’s wife, serving as the
firm’s office manager, later wrote the name John Leed on the check and
deposited the check in a regular (non-trust) account she had set up in
Leed’s name. Shortly thereafter, she closed the Leed account and
transferred the funds to the office account for her business—D’Angelo Tax
Service and Accounting. O’Rourke never met with Leed, never knew of Leed,
and was never told any attorney besides D’Angelo would be working on her
bankruptcy. Leed was a different attorney that D’Angelo claims was helping
with pending cases after his license was suspended. D’Angelo was unable to
locate Leed and therefore he did not testify before the Commission.[1]
 In February and March of 2001, O’Rourke sent checks to D’Angelo for
$75 and $325 respectively. These two payments were deposited directly into
D’Angelo’s office account. O’Rourke spoke with D’Angelo on more than seven
different occasions about the status of the bankruptcy proceedings. At no
time did D’Angelo tell her that his license had been suspended. O’Rourke
eventually learned from another attorney that D’Angelo had been suspended,
so she filed a complaint with the Attorney Disciplinary Board. She
immediately received a refund of $850 from D’Angelo. D’Angelo responded to
the Board’s complaint nearly two years later.
 B.  Kemp Matter
 Sherene Kemp went to D’Angelo’s law office in June of 2000 to discuss
a bankruptcy proceeding. She was told by a receptionist that D’Angelo was
unavailable, but the receptionist asked her to prepare a list of all bills
and financial records. Kemp was told the total fees for the bankruptcy
would be $850. Kemp paid $400 cash on June 23, 2000. This money was never
deposited in a trust account. On November 16, 2000, D’Angelo was suspended
from the practice of law. D’Angelo did not tell Kemp he was suspended. On
February 20, 2001, three months after he was suspended, D’Angelo sent Kemp
a bill for an additional $450. Kemp paid this bill, but the $450 was never
placed in a trust account and the bankruptcy petition was never filed. In
September of 2001, after Kemp learned of D’Angelo’s suspension and
telephoned his office, D’Angelo refunded the entire $850. D’Angelo did not
respond to the Board’s notice of complaint over this issue for two years.

 C.  Benson-Blaine Matter
 In September of 1999, Susan Benson-Blaine paid D’Angelo a $300
retainer to seek sole custody of her child and to seek termination of the
father’s visitation and parental rights. The petition was served in
February 2000, but D’Angelo stopped returning Benson-Blaine’s phone calls.
Benson-Blaine eventually sought the advice of another attorney. This
attorney wrote D’Angelo a letter, but he never responded. D’Angelo
remained Benson-Blaine’s counsel of record and did not formally withdraw
from her case even after his license had been formally suspended. On
January 17, 2002, Benson-Blaine’s case was dismissed for failure to
prosecute. Benson-Blaine contacted the Client Security Commission and then
received a $300 refund from D’Angelo’s office. D’Angelo did not respond to
the Board’s complaints for two years.
 D.  Knapp Matter
 In July of 1999, Julie Knapp was named the administrator of her
father’s estate. D’Angelo was designated as the attorney for the estate.
D’Angelo petitioned the court to sell a piece of estate property. The
court set a hearing and issued an order indicating that all interested
parties were to receive notice of the hearing and that proof of mailing
notice was to be on file before the time of the hearing. D’Angelo then
prepared a decree stating that notice had been given to all interested
parties, even though D’Angelo had never filed a proof of notice to the
interested parties. D’Angelo then secured a judge’s signature to a decree
approving the sale of the property.
 After D’Angelo’s license to practice law was suspended in November of
2000, the court appointed a trustee to review the case file. The trustee
discovered that D’Angelo took approximately $5426.74 in fees from the
estate. The fees included $2500 for services in connection with the sale
of the decedent’s residence, $2000 for “Estate Legal Fees,” and $926.74 for
representing Julie Knapp in a dissolution of marriage action. D’Angelo
also deposited an additional $2796.65 from the proceeds of the auction of
the estate’s personal property into his trust account. This money was
subsequently withdrawn and D’Angelo is unable to explain where the money is
now.
 Under Iowa law, a lawyer taking a fee for any estate proceeding must
first obtain a court order authorizing the fee. See Iowa Code §§ 633.197-
.198 (1997) (authorizing payment of “reasonable fees as may be determined
by the court”). D’Angelo received no such authorization. In addition, the
maximum fee for ordinary services for a $45,000 estate would have been only
about $1000.
 The final report prepared by D’Angelo lacked pertinent documents. The
report stated an accounting of receipts and disbursements was attached, but
no such accounting was attached to the report. The final report also
asserts that an income tax certificate of acquittance was on file and that
all statutory requirements pertaining to taxes were on file. However,
neither the Iowa inheritance tax clearance nor the income tax certificate
were actually on file. The final report presented by Knapp and prepared by
D’Angelo also did not include an accounting nor a waiver of accounting by
the interested parties. See id. § 633.477(9).
 D’Angelo did not respond to the Board’s complaint concerning these
charges for nearly a year.
 E.  Eckert Matter
 In September of 1998, D’Angelo was hired to represent Gary Eckert,
administrator of the estate of James Arthur Eckert. In November of 2000,
D’Angelo accepted a $4541 check from Eckert for his work on the estate.
D’Angelo deposited this check in his trust account and almost immediately
withdrew $2846 of the proceeds from the trust account without court
authorization.[2] It is not clear when D’Angelo withdrew additional
proceeds from the original $4541, but by April 2001, only $657.73 remained
in his trust account for the Eckert estate. D’Angelo cannot verify why the
funds were withdrawn, but speculates they may have been inadvertently
withdrawn from the Eckert estate trust account for payments related to
personal work done for Gary Eckert.
 D’Angelo also received a $6057.73 check from Eckert in April 1999, the
date the inheritance tax return was signed by Eckert. D’Angelo did not
file the inheritance tax return and the funds were not provided to the Iowa
Department of Revenue for payment of the inheritance tax. D’Angelo does
not know what happened to these funds. After a claim was filed with the
Client Security Commission, D’Angelo reimbursed the Eckert estate for the
missing funds.
 F.  Roberson Matter
 In 1997, Jina Roberson hired D’Angelo to handle her bankruptcy for a
flat-fee of $800. Roberson initially paid D’Angelo $200. Because of
concerns about the status of property she owned in California with her ex-
husband, Roberson decided not to file the bankruptcy. Roberson then moved
to Texas. In the fall of 1999, the California real estate was sold. In
January of 2000, Roberson received documents regarding the sale proceeding
and sent those documents to D’Angelo. D’Angelo wrote the attorney named in
those documents requesting information regarding the sale of the property
and the debts needed to be paid from Roberson’s share of the proceeds. In
February of 2000, a California court awarded Roberson $10,879.43 for her
share of the proceeds. On February 17, 2000, a check for this amount was
sent to D’Angelo, payable to Roberson. D’Angelo did not tell Roberson he
received the check. Instead, in March, he sent Roberson a letter informing
her “it does not appear that after all the payments are made, there should
be funds to be divided.”
 On October 12, 2000, the check was deposited into D’Angelo’s trust
account. Although Roberson had never seen the check, it was endorsed in
her name. On October 19, 2000, D’Angelo sent Roberson a check for $5600
with an explanation on the check reading “J. Graves Property Settlement.”
He did not mention that the original check had been for $10,879.43. On the
same day, D’Angelo also withdrew $2779.79 from the trust account for “Legal
fees in conjunction with property settlement & bankruptcy legal fee
including filing fee.” No bankruptcy petition was ever filed. The
remaining $2499.64 inexplicably vanished from the trust account.
 Roberson eventually filed a claim with the Client Security Commission.
 At the direction of the Commission, D’Angelo restored $2499.64 to Roberson
three years later.
 IV.  Ethical Violations
 We first discuss those violations which occurred while D’Angelo was
suspended from the practice of law, and then discuss those violations which
occurred prior to his 2000 suspension.
 A.  Ethical Violations Occurring During His Suspension
 1.  Practice of Law During Suspension
 By meeting with O’Rourke at his office in December of 2000 and holding
himself out as a lawyer while his license was suspended, D’Angelo violated
DR 3-101(B) (stating a lawyer shall not practice law where to do so would
be in violation of rules of jurisdiction), DR 7-106(A) (stating a lawyer
shall not disregard court order), and Iowa Court Rule 35.12 (providing a
suspended lawyer shall refrain from all facets of practice of law). A
lawyer who misinforms or fails to inform a client as to his ineligibility
to practice is guilty of dishonesty, fraud, deceit or misrepresentation, in
violation of DR 1-102(A)(4). See Iowa Supreme Ct. Bd. of Prof’l Ethics &
Conduct v. Apland, 599 N.W.2d 453, 455 (Iowa 1999).[3] We find a similar
violation in the Kemp matter because, three months after his license had
been suspended, he sent a bill to Kemp for services which he had not yet
performed.
 Even if D’Angelo had properly informed O’Rourke that his license to
practice law was suspended and that somehow Leed would be her new attorney,
such a scheme would not be in compliance with our rules of suspension.
According to Iowa Court Rule 35.12(3), a suspended lawyer shall refrain

 from all facets of the ordinary law practice including, but not
 limited to, the examination of abstracts; consummation of real estate
 transactions; preparation of legal briefs, deeds, buy and sell
 agreements, contracts, wills, and tax returns; and acting as a
 fiduciary.

(Emphasis added.) At best, it would appear D’Angelo was using Leed or
Leed’s name as a false front, hoping to maintain his client base. Some
clients may be willing to wait out an attorney’s suspension, but any
attempt to assign client cases, with a wink and a nod, to another attorney
who will sign pertinent documents and keep the law office open during the
period of suspension is a violation of the aforementioned rule.
 2.  Failure to Cooperate with the Board
 D’Angelo was dilatory in responding to the Board’s notices of
complaint in the O’Rourke, Kemp, Benson-Blaine, and Knapp matters. Delay
in responding to the Board is inexcusable and a violation of DR-102(A)(5),
(6) (conduct prejudicial to administration of justice and conduct
reflecting adversely on fitness to practice law). See Iowa Supreme Ct. Bd.
of Prof’l Ethics & Conduct v. Kallsen, 670 N.W.2d 161, 167 (Iowa 2003).
Responding to the Client Security Commission, but ignoring complaints from
the Board, constitutes a failure to cooperate with the Board.
 B.  Violations Prior to His First Suspension
 1.  Misrepresentations to the Court
 In the Knapp matter, D’Angelo intentionally disregarded a court order
in violation of DR 7-106(A) when he failed to provide other parties with
proper notice of the sale of the property. He also violated DR 1-102(A)(4)
(stating a lawyer shall not engage in dishonesty, fraud, deceit, or
misrepresentation) and DR 7-102(A)(3), (5) (stating a lawyer shall not
knowingly conceal or fail to disclose that which a lawyer is required to
reveal or knowingly make a false statement) when he made misrepresentations
to the court to obtain an order allowing the sale of the property.
D’Angelo also made misrepresentations in the final report in violation of
DR 7-102(A)(3), (5).
 These misrepresentations are particularly egregious when viewed in
light of D’Angelo’s previous public reprimand for conduct involving
dishonesty towards the court. On November 15, 1996, D’Angelo received a
public reprimand by drafting and obtaining a judge’s signature on a
dissolution decree that varied from the parties’ stipulation. Similar
conduct in this case—obtaining a court’s signature on a document which
contained misrepresentations—demonstrates D’Angelo did not alter his
behavior after the public reprimand.
 2.  Neglect
 By abandoning Benson-Blaine’s case and failing to seek her lawful
objectives, D’Angelo neglected client matters and violated DR 6-101(A)(3)
(“A lawyer shall not . . . [n]eglect a client’s legal matter.”).
 3.  Trust Fund Violations/Taking Client Funds Without Prior
      Authorization
 Client funds paid to an attorney must be deposited into an interest-
bearing trust account, rather than the firm’s operating account, until they
are earned. Kadenge, 706 N.W.2d at 408; Iowa Supreme Ct. Bd. of Prof'l
Ethics & Conduct v. Herrera, 560 N.W.2d 592, 594 (Iowa 1997). D’Angelo’s
failure to deposit Kemp’s payments in a trust account was a violation of DR
9-102(A) (requiring client funds to be deposited to trust account until
earned). At least part of the $850 flat fee paid by Kemp had not been
earned because the bankruptcy petition was neither filed nor completed.
See Iowa Supreme Ct. Bd. of Prof’l Ethics & Conduct v. Sullins, 648 N.W.2d
127, 134 (Iowa 2002) (“[P]resuming the flat fee is fair, the attorney is
entitled to the entire amount when he or she completes the necessary
services.”); Iowa Supreme Ct. Bd. of Prof’l Ethics & Conduct v. Winkel, 599
N.W.2d 456, 459 (Iowa 1999) (“A lawyer who takes a fee before it is earned
effectively misappropriates the client’s funds.”).
 D’Angelo also violated DR 9-102(A) in the Knapp and Roberson matters
when he inexplicably “lost” funds that were supposed to be kept in client
trust accounts.
 D’Angelo also violated DR 9-102(B)(3), (4) (requiring a lawyer to
account for and properly return funds to which a client is entitled) in the
Kemp matter when he violated Court Rule 35.21(c) by not refunding unearned
fees within 30 days of his suspension.
 In the Eckert matter, D’Angelo violated Iowa Code section 633.198 when
he took fees for his work in a probate matter before he received court
authorization. See Iowa Supreme Ct. Bd. of Prof’l Ethics & Conduct v.
Reese, 657 N.W.2d 457, 461 (Iowa 2003) (stating a lawyer may not take fees
for a probate matter until authorized to do so by the court).
 Because restitution is a lawyer’s duty, the fact that D’Angelo paid
the money back to these clients after they filed complaints is not a valid
defense or excuse for these ethical violations. See Iowa Supreme Ct. Bd.
of Prof’l Ethics & Conduct v. Stowers, 626 N.W.2d 130, 133 (Iowa 2001). To
allow such payments to serve as mitigating factors “might imply to the
public that an officer of the court can buy his way out of professional
difficulties if financially able to do so.” Iowa Supreme Ct. Bd. of Prof’l
Ethics & Conduct v. Havercamp, 442 N.W.2d 67, 72 (Iowa 1989).
4.  Misappropriation of Client Funds
 In the Roberson matter, we make no finding as to whether D’Angelo
personally forged Roberson’s signature in order to endorse her check.
D’Angelo and the Board provided conflicting expert testimony regarding the
exact identity of the forger. We make two findings: Roberson never signed
the check, and the check was at all times under the control of D’Angelo’s
law firm. Based upon these findings and D’Angelo’s attempt to pay Roberson
only $5600 of the more than $10,000 which he wrongfully held, we conclude
D’Angelo misappropriated funds entrusted to him in a professional capacity.

 The amount misappropriated was at least $2499.64, and likely more
because D’Angelo’s limited legal work did not warrant a fee of $2779.79.
We conclude this fee was excessive in violation of DR 2-106(A) (prohibiting
a lawyer from collecting a clearly excessive fee) because D’Angelo did not
participate in the California real estate proceeding to obtain a settlement
for Roberson and he did not file a bankruptcy petition on Roberson’s
behalf. He also violated DR 1-102(A)(4) (stating a lawyer shall not engage
in dishonesty, fraud, deceit, or misrepresentation) when he billed Roberson
for a filing fee for a bankruptcy that was never filed. D’Angelo also
violated DR 9-102(B)(4) (failing to promptly pay a client funds they are
entitled to receive) when he did not send her the remaining $2449.64 until
over three years later when he was directed to do so by the Client Security
Commission.
 It becomes more difficult to attribute misappropriations to sloppiness
when client funds repeatedly disappear without explanation. Therefore,
based upon his actions in the Roberson matter and the missing $6057.73 in
the Eckert matter, we conclude D’Angelo intentionally misappropriated
client funds in violation of DR 1-102(A)(3) for illegal conduct involving
moral turpitude and DR 1-102(A)(4) for conduct involving dishonesty, fraud,
deceit or misrepresentation.
 V.  Disposition
 There is no standard discipline for a particular type of attorney
misconduct because “[e]ach case rests on its own facts, viewed in light of
the relevant governing considerations.” Iowa Supreme Ct. Bd. of Prof’l
Ethics & Conduct v. Bernard, 653 N.W.2d 373, 376 (Iowa 2002). “[T]he
nature of the alleged violations, the need for deterrence, protection of
the public, maintenance of the reputation of the bar as a whole and the
respondent’s fitness to continue in the practice of law” are all factors
that guide our determination. Comm. on Prof’l Ethics & Conduct v. Blomker,
379 N.W.2d 19, 21 (Iowa 1985).
 When we analyzed the allegations presented against D’Angelo in 2000,
we concluded D’Angelo’s activities were not fundamentally dishonest because
the misappropriations were, with one exception,[4] limited to the taking of
unauthorized and premature probate fees. D’Angelo I, 619 N.W.2d at 339.
We characterized D’Angelo as “inattentive” and “sloppy,” but not
intentionally dishonest. Id. When D’Angelo was before us again in 2002
for similar violations predating his 2002 suspension, we gave him a one
year concurrent sentence because “[h]ad these additional matters been
brought to our attention at [the time of the first suspension], we
seriously doubt that [his] prior suspension . . . would have been
enlarged.” D’Angelo II, 652 N.W.2d at 215.
 D’Angelo again asks this court for leniency because most of the
violations before us today predate his 2000 suspension. He also asks for
leniency because, in his opinion, the violations are of the same type for
which he has already been punished. We do not agree that the violations
are the same, and we do not find leniency is appropriate.
 “A deliberate conversion of client funds ordinarily demands revocation
of the lawyer’s license.” D’Angelo I, 619 N.W.2d at 339; see Iowa Supreme
Ct. Bd. of Prof’l Ethics & Conduct v. Anderson, 687 N.W.2d 587 (Iowa 2004)
(revoking license for conversion of entrusted funds); Iowa Supreme Ct. Bd.
of Prof’l Ethics & Conduct v. Allen, 586 N.W.2d 383, 389-90 (Iowa 1998)
(cataloguing cases where we have revoked an attorney’s license for theft of
entrusted funds). However, we have recognized other factors which call for
leniency. As we stated in our opinion concerning D’Angelo’s 2000
suspension, a penalty less than revocation is appropriate when the
commingling of funds appears to be negligent, rather than intentional, or
when the funds were not knowingly converted to the lawyer’s own use, or
when no client suffered a financial loss. D’Angelo I, 619 N.W.2d at 339.
In light of the sheer number of times D’Angelo improperly moved client
money from his client trust account to his operating account, we simply
cannot conclude the commingling of client funds was negligent, rather than
intentional. Similarly, the fact that the funds have vanished, without
explanation, to the detriment of numerous clients, leads us to believe
these minimizing factors are no longer applicable.
 This will be the last time we consider D’Angelo’s ethical violations.
He has misappropriated client funds, practiced law after his license was
suspended, neglected his clients, made misrepresentations to the court, and
repeatedly failed to cooperate with the Attorney Disciplinary Board. These
numerous violations are unacceptable, and we conclude the public will not
be protected if D’Angelo is allowed to practice law again. See Iowa
Supreme Ct. Bd. of Prof’l Ethics & Conduct v. Leon, 602 N.W.2d 336, 339
(Iowa 1999) (stating revocation is necessary to protect the public when
there is “a pattern of misconduct [that] leads us to conclude that future
misconduct is likely”). We therefore revoke D’Angelo’s license to practice
law. Costs are assessed to D’Angelo pursuant to Iowa Court Rule 35.25.
 License Revoked.
 All justices concur except Larson, J., who takes no part.

-----------------------
 [1]D’Angelo’s supposed reliance on Leed did not go well. Leed did not
attend to D’Angelo’s cases and, apparently unbeknownst to D’Angelo, Leed’s
license to practice law was also suspended as of November, 2000.
 [2]The statutory fee on an $85,000 estate should only have been
approximately $1900. See Iowa Code § 633.197.
 [3]Because of his suspension, D’Angelo was ineligible to counsel and
represent clients in bankruptcy, even though bankruptcy cases are heard in
federal court. See Iowa Supreme Ct. Comm’n on Unauthorized Practice of Law
v. Sturgeon, 635 N.W.2d 679, 686 (Iowa 2001) (affirming injunction barring
disbarred lawyer from drafting bankruptcy pleadings for clients); Matter of
Perrello, 386 N.E.2d 174, 179 (Ind. 1979) (holding a lawyer violated
suspension order of Indiana Supreme Court by continuing to practice law in
the state, even though practice was in federal court).
 [4]The one exception was in the estate of Earl Smith, where in a case
eerily similar to the Eckert matter now before us, D’Angelo took funds
intended for the Iowa inheritance tax, placed them in his firm operating
account, and then withdrew the funds without explanation. D’Angelo I, 619
N.W.2d at 335.