**IOWA SUPREME COURT ATTORNEY DISCIPLINARY BOARD,**
Complainant,

v.

**N. Michael D'ANGELO, Respondent.**

No. 05–1589.

Supreme Court of Iowa.

Feb. 24, 2006.

Michael J. Carroll of Babich, Goldman, Cashatt and Renzo, P.C., Des Moines, and Roger J. Kuhle of Law Office of Roger J. Kuhle, Indianola, for respondent.

Charles L. Harrington, and Teresa A. Vens, Des Moines, for complainant.

STREIT, Justice.

The Iowa Supreme Court Attorney Disciplinary Board ("Board") filed a complaint against the respondent, N. Michael D'Angelo, alleging he had violated several provisions of the Iowa Code of Professional Responsibility by misappropriating client funds, neglecting client matters, mishandling his trust account, making misrepresentations, and failing to respond to inquiries from the Board. The Grievance Commission found the Board proved the alleged violations and recommended we revoke D'Angelo's license to practice law.

We find the Board proved these ethical violations. Based on the seriousness and number of violations, we believe a revocation is warranted.

## I.  Background Facts

D'Angelo is a sole practitioner in Oakland, Iowa who was admitted to practice law in 1971. D'Angelo has received numerous sanctions for previous ethical violations.

On November 15, 1996, he was publicly reprimanded for conduct involving dishonesty, fraud, deceit or misrepresentation, conduct prejudicial to the administration of justice, and conduct reflecting adversely on his fitness to practice law for drafting a dissolution decree that varied from the parties' stipulation and obtaining a judge's signature thereon.

On November 16, 2000, we suspended his law license indefinitely, with no possibility of reinstatement for three years, for accepting fees for probate work prior to obtaining a court order authorizing the fees, depositing client funds into his operating account, displaying general neglect and lack of communication with his clients, complying with a court order only upon threat of contempt, and disregarding rules pertaining to the disciplinary process. *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. D'Angelo,* 619 N.W.2d 333, 337–39 (Iowa 2000) (hereinafter *"D'Angelo I"*).

On October 22, 2002, D'Angelo was again before this court for newly discovered violations which occurred both before and after his 2000 suspension. *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. D'Angelo,* 652 N.W.2d 213, 215–16 (Iowa 2002) (hereinafter *"D'Angelo II"*). The violations which occurred prior to his first suspension consisted of client neglect and collection of fees without court authorization. *Id.* at 215. The violations which occurred after his first suspension consisted of failing to cooperate with the board concerning the new charges against him and failing to comply with the previous suspension order by not refunding unearned fees to his clients. *Id.* We suspended D'Angelo for one year and prohibited him from handling probate matters unless he associated himself with a competent probate lawyer. *Id.* at 215–16. Because most of these violations were part of the same pattern of conduct that led to his previous suspension in 2000, we ran the suspensions concurrently. *Id.* D'Angelo's suspensions ended in November of 2003, but he has not yet applied for reinstatement.

Remarkably, D'Angelo is here before us again for violations which occurred both before and after his 2000 suspension.

## II.  Standard of Review

██ We review attorney disciplinary proceedings de novo. *Iowa Supreme Ct.*

*Attorney Disciplinary Bd. v. Kadenge*, 706 N.W.2d 403, 405 (Iowa 2005); Iowa Ct. R. 35.10(1). We give respectful consideration to the Commission's findings and recommendations, but are not bound by them. *See Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Bell*, 650 N.W.2d 648, 650 (Iowa 2002) (revoking license even though Commission recommended five-year suspension). The Board must prove attorney misconduct by a convincing preponderance of the evidence. *Kadenge*, 706 N.W.2d at 406. This burden is "less than proof beyond a reasonable doubt, but more than the preponderance standard required in the usual civil case." *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Lett*, 674 N.W.2d 139, 142 (Iowa 2004).

### III. Factual Findings

D'Angelo refutes many of the Board's allegations and pits his own testimony, the testimony of his wife, and the testimony of his secretary against the evidence offered by the Board. It is not our custom to attempt to set out the evidence in detail and try to harmonize the testimony of opposing witnesses in our opinions. *Benton County Sav. Bank v. First Nat'l Bank*, 179 Iowa 993, 996, 162 N.W. 204, 205 (1917). The Commission considered the testimony and evidence from his former clients more credible, and after our de novo review of the record, we do not disturb the Commission's credibility findings. Based upon D'Angelo's admissions and the evidence presented to the Commission concerning the various ethical violations, we find the Board proved the following by a convincing preponderance of the evidence.

### A. O'Rourke Matter

D'Angelo met with Beverly O'Rourke on December 15, 2000, a full month after his license to practice law had been suspended. O'Rourke retained D'Angelo to handle her bankruptcy proceeding and gave him a check for a $450 retainer. When O'Rourke asked how to spell "D'Angelo," he told her to just leave the "payable to" line blank. D'Angelo's wife, serving as the firm's office manager, later wrote the name John Leed on the check and deposited the check in a regular (non-trust) account she had set up in Leed's name. Shortly thereafter, she closed the Leed account and transferred the funds to the office account for her business—D'Angelo Tax Service and Accounting. O'Rourke never met with Leed, never knew of Leed, and was never told any attorney besides D'Angelo would be working on her bankruptcy. Leed was a different attorney that D'Angelo claims was helping with pending cases after his license was suspended. D'Angelo was unable to locate Leed and therefore he did not testify before the Commission.[1]

In February and March of 2001, O'Rourke sent checks to D'Angelo for $75 and $325 respectively. These two payments were deposited directly into D'Angelo's office account. O'Rourke spoke with D'Angelo on more than seven different occasions about the status of the bankruptcy proceedings. At no time did D'Angelo tell her that his license had been suspended. O'Rourke eventually learned from another attorney that D'Angelo had been suspended, so she filed a complaint with the Attorney Disciplinary Board. She immediately received a refund of $850 from D'Angelo. D'Angelo responded to the Board's complaint nearly two years later.

### B. Kemp Matter

Sherene Kemp went to D'Angelo's law office in June of 2000 to discuss a bank-

---

1. D'Angelo's supposed reliance on Leed did not go well. Leed did not attend to D'Angelo's cases and, apparently unbeknownst to D'Angelo, Leed's license to practice law was also suspended as of November, 2000.

ruptcy proceeding. She was told by a receptionist that D'Angelo was unavailable, but the receptionist asked her to prepare a list of all bills and financial records. Kemp was told the total fees for the bankruptcy would be $850. Kemp paid $400 cash on June 23, 2000. This money was never deposited in a trust account. On November 16, 2000, D'Angelo was suspended from the practice of law. D'Angelo did not tell Kemp he was suspended. On February 20, 2001, three months after he was suspended, D'Angelo sent Kemp a bill for an additional $450. Kemp paid this bill, but the $450 was never placed in a trust account and the bankruptcy petition was never filed. In September of 2001, after Kemp learned of D'Angelo's suspension and telephoned his office, D'Angelo refunded the entire $850. D'Angelo did not respond to the Board's notice of complaint over this issue for two years.

## C. Benson–Blaine Matter

In September of 1999, Susan Benson–Blaine paid D'Angelo a $300 retainer to seek sole custody of her child and to seek termination of the father's visitation and parental rights. The petition was served in February 2000, but D'Angelo stopped returning Benson–Blaine's phone calls. Benson–Blaine eventually sought the advice of another attorney. This attorney wrote D'Angelo a letter, but he never responded. D'Angelo remained Benson–Blaine's counsel of record and did not formally withdraw from her case even after his license had been formally suspended. On January 17, 2002, Benson–Blaine's case was dismissed for failure to prosecute. Benson–Blaine contacted the Client Security Commission and then received a $300 refund from D'Angelo's office. D'Angelo did not respond to the Board's complaints for two years.

## D. Knapp Matter

In July of 1999, Julie Knapp was named the administrator of her father's estate. D'Angelo was designated as the attorney for the estate. D'Angelo petitioned the court to sell a piece of estate property. The court set a hearing and issued an order indicating that all interested parties were to receive notice of the hearing and that proof of mailing notice was to be on file before the time of the hearing. D'Angelo then prepared a decree stating that notice had been given to all interested parties, even though D'Angelo had never filed a proof of notice to the interested parties. D'Angelo then secured a judge's signature to a decree approving the sale of the property.

After D'Angelo's license to practice law was suspended in November of 2000, the court appointed a trustee to review the case file. The trustee discovered that D'Angelo took approximately $5426.74 in fees from the estate. The fees included $2500 for services in connection with the sale of the decedent's residence, $2000 for "Estate Legal Fees," and $926.74 for representing Julie Knapp in a dissolution of marriage action. D'Angelo also deposited an additional $2796.65 from the proceeds of the auction of the estate's personal property into his trust account. This money was subsequently withdrawn and D'Angelo is unable to explain where the money is now.

Under Iowa law, a lawyer taking a fee for any estate proceeding must first obtain a court order authorizing the fee. *See* Iowa Code §§ 633.197–.198 (1997) (authorizing payment of "reasonable fees as may be determined by the court"). D'Angelo received no such authorization. In addition, the maximum fee for ordinary services for a $45,000 estate would have been only about $1000.

The final report prepared by D'Angelo lacked pertinent documents. The report stated an accounting of receipts and disbursements was attached, but no such accounting was attached to the report. The final report also asserts that an income tax certificate of acquittance was on file and that all statutory requirements pertaining to taxes were on file. However, neither the Iowa inheritance tax clearance nor the income tax certificate were actually on file. The final report presented by Knapp and prepared by D'Angelo also did not include an accounting nor a waiver of accounting by the interested parties. *See id.* § 633.477(9).

D'Angelo did not respond to the Board's complaint concerning these charges for nearly a year.

### E.  Eckert Matter

In September of 1998, D'Angelo was hired to represent Gary Eckert, administrator of the estate of James Arthur Eckert. In November of 2000, D'Angelo accepted a $4541 check from Eckert for his work on the estate. D'Angelo deposited this check in his trust account and almost immediately withdrew $2846 of the proceeds from the trust account without court authorization.[2] It is not clear when D'Angelo withdrew additional proceeds from the original $4541, but by April 2001, only $657.73 remained in his trust account for the Eckert estate. D'Angelo cannot verify why the funds were withdrawn, but speculates they may have been inadvertently withdrawn from the Eckert estate trust account for payments related to personal work done for Gary Eckert.

D'Angelo also received a $6057.73 check from Eckert in April 1999, the date the inheritance tax return was signed by Eckert. D'Angelo did not file the inheritance tax return and the funds were not provided to the Iowa Department of Revenue for payment of the inheritance tax. D'Angelo does not know what happened to these funds. After a claim was filed with the Client Security Commission, D'Angelo reimbursed the Eckert estate for the missing funds.

### F.  Roberson Matter

In 1997, Jina Roberson hired D'Angelo to handle her bankruptcy for a flat-fee of $800. Roberson initially paid D'Angelo $200. Because of concerns about the status of property she owned in California with her ex-husband, Roberson decided not to file the bankruptcy. Roberson then moved to Texas. In the fall of 1999, the California real estate was sold. In January of 2000, Roberson received documents regarding the sale proceeding and sent those documents to D'Angelo. D'Angelo wrote the attorney named in those documents requesting information regarding the sale of the property and the debts needed to be paid from Roberson's share of the proceeds. In February of 2000, a California court awarded Roberson $10,879.43 for her share of the proceeds. On February 17, 2000, a check for this amount was sent to D'Angelo, payable to Roberson. D'Angelo did not tell Roberson he received the check. Instead, in March, he sent Roberson a letter informing her "it does not appear that after all the payments are made, there should be funds to be divided."

On October 12, 2000, the check was deposited into D'Angelo's trust account. Although Roberson had never seen the check, it was endorsed in her name. On

---

2.  The statutory fee on an $85,000 estate should only have been approximately $1900. *See* Iowa Code § 633.197.

October 19, 2000, D'Angelo sent Roberson a check for $5600 with an explanation on the check reading "J. Graves Property Settlement." He did not mention that the original check had been for $10,879.43. On the same day, D'Angelo also withdrew $2779.79 from the trust account for "Legal fees in conjunction with property settlement & bankruptcy legal fee including filing fee." No bankruptcy petition was ever filed. The remaining $2499.64 inexplicably vanished from the trust account.

Roberson eventually filed a claim with the Client Security Commission. At the direction of the Commission, D'Angelo restored $2499.64 to Roberson three years later.

## IV. Ethical Violations

We first discuss those violations which occurred while D'Angelo was suspended from the practice of law, and then discuss those violations which occurred prior to his 2000 suspension.

### A. Ethical Violations Occurring During His Suspension

#### 1. Practice of Law During Suspension

■ By meeting with O'Rourke at his office in December of 2000 and holding himself out as a lawyer while his license was suspended, D'Angelo violated DR 3–101(B) (stating a lawyer shall not practice law where to do so would be in violation of rules of jurisdiction), DR 7–106(A) (stating a lawyer shall not disregard court order), and Iowa Court Rule 35.12 (providing a suspended lawyer shall refrain from all

facets of practice of law). A lawyer who misinforms or fails to inform a client as to his ineligibility to practice is guilty of dishonesty, fraud, deceit or misrepresentation, in violation of DR 1–102(A)(4). *See Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Apland,* 599 N.W.2d 453, 455 (Iowa 1999).[3] We find a similar violation in the Kemp matter because, three months after his license had been suspended, he sent a bill to Kemp for services which he had not yet performed.

■ Even if D'Angelo had properly informed O'Rourke that his license to practice law was suspended and that somehow Leed would be her new attorney, such a scheme would not be in compliance with our rules of suspension. According to Iowa Court Rule 35.12(3), a suspended lawyer shall refrain

> from *all facets of the ordinary law practice* including, but not limited to, the examination of abstracts; consummation of real estate transactions; preparation of legal briefs, deeds, buy and sell agreements, contracts, wills, and tax returns; and acting as a fiduciary.

(Emphasis added.) At best, it would appear D'Angelo was using Leed or Leed's name as a false front, hoping to maintain his client base. Some clients may be willing to wait out an attorney's suspension, but any attempt to assign client cases, with a wink and a nod, to another attorney who will sign pertinent documents and keep the law office open during the period of suspension is a violation of the aforementioned rule.

---

3. Because of his suspension, D'Angelo was ineligible to counsel and represent clients in bankruptcy, even though bankruptcy cases are heard in federal court. *See Iowa Supreme Ct. Commission on Unauthorized Practice of Law v. Sturgeon,* 635 N.W.2d 679, 686 (Iowa 2001) (affirming injunction barring disbarred lawyer from drafting bankruptcy pleadings for clients); *Matter of Perrello,* 270 Ind. 390, 386 N.E.2d 174, 179 (1979) (holding a lawyer violated suspension order of Indiana Supreme Court by continuing to practice law in the state, even though practice was in federal court).

### 2. Failure to Cooperate with the Board

■ D'Angelo was dilatory in responding to the Board's notices of complaint in the O'Rourke, Kemp, Benson–Blaine, and Knapp matters. Delay in responding to the Board is inexcusable and a violation of DR–102(A)(5), (6) (conduct prejudicial to administration of justice and conduct reflecting adversely on fitness to practice law). *See Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Kallsen*, 670 N.W.2d 161, 167 (Iowa 2003). Responding to the Client Security Commission, but ignoring complaints from the Board, constitutes a failure to cooperate with the Board.

### B. Violations Prior to His First Suspension

### 1. Misrepresentations to the Court

■ In the Knapp matter, D'Angelo intentionally disregarded a court order in violation of DR 7–106(A) when he failed to provide other parties with proper notice of the sale of the property. He also violated DR 1–102(A)(4) (stating a lawyer shall not engage in dishonesty, fraud, deceit, or misrepresentation) and DR 7–102(A)(3), (5) (stating a lawyer shall not knowingly conceal or fail to disclose that which a lawyer is required to reveal or knowingly make a false statement) when he made misrepresentations to the court to obtain an order allowing the sale of the property. D'Angelo also made misrepresentations in the final report in violation of DR 7–102(A)(3), (5).

These misrepresentations are particularly egregious when viewed in light of D'Angelo's previous public reprimand for conduct involving dishonesty towards the court. On November 15, 1996, D'Angelo received a public reprimand by drafting and obtaining a judge's signature on a dissolution decree that varied from the parties' stipulation. Similar conduct in this case—obtaining a court's signature on a document which contained misrepresentations—demonstrates D'Angelo did not alter his behavior after the public reprimand.

### 2. Neglect

■ By abandoning Benson–Blaine's case and failing to seek her lawful objectives, D'Angelo neglected client matters and violated DR 6–101(A)(3) ("A lawyer shall not ... [n]eglect a client's legal matter.").

### 3. Trust Fund Violations/Taking Client Funds Without Prior Authorization

■ Client funds paid to an attorney must be deposited into an interest-bearing trust account, rather than the firm's operating account, until they are earned. *Kadenge*, 706 N.W.2d at 408; *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Herrera*, 560 N.W.2d 592, 594 (Iowa 1997). D'Angelo's failure to deposit Kemp's payments in a trust account was a violation of DR 9–102(A) (requiring client funds to be deposited to trust account until earned). At least part of the $850 flat fee paid by Kemp had not been earned because the bankruptcy petition was neither filed nor completed. *See Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Sullins*, 648 N.W.2d 127, 134 (Iowa 2002) ("[P]resuming the flat fee is fair, the attorney is entitled to the entire amount when he or she completes the necessary services."); *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Winkel*, 599 N.W.2d 456, 459 (Iowa 1999) ("A lawyer who takes a fee before it is earned effectively misappropriates the client's funds.").

■ D'Angelo also violated DR 9–102(A) in the Knapp and Roberson matters when he inexplicably "lost" funds that

were supposed to be kept in client trust accounts.

■ D'Angelo also violated DR 9–102(B)(3), (4) (requiring a lawyer to account for and properly return funds to which a client is entitled) in the Kemp matter when he violated Court Rule 35.21(c) by not refunding unearned fees within 30 days of his suspension.

In the Eckert matter, D'Angelo violated Iowa Code section 633.198 when he took fees for his work in a probate matter before he received court authorization. *See Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Reese,* 657 N.W.2d 457, 461 (Iowa 2003) (stating a lawyer may not take fees for a probate matter until authorized to do so by the court).

■ Because restitution is a lawyer's duty, the fact that D'Angelo paid the money back to these clients after they filed complaints is not a valid defense or excuse for these ethical violations. *See Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Stowers,* 626 N.W.2d 130, 133 (Iowa 2001). To allow such payments to serve as mitigating factors "might imply to the public that an officer of the court can buy his way out of professional difficulties if financially able to do so." *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Havercamp,* 442 N.W.2d 67, 72 (Iowa 1989).

### 4. Misappropriation of Client Funds

■ In the Roberson matter, we make no finding as to whether D'Angelo personally forged Roberson's signature in order to endorse her check. D'Angelo and the Board provided conflicting expert testimony regarding the exact identity of the forger. We make two findings: Roberson never signed the check, and the check was at all times under the control of D'Angelo's law firm. Based upon these findings and D'Angelo's attempt to pay Roberson only

$5600 of the more than $10,000 which he wrongfully held, we conclude D'Angelo misappropriated funds entrusted to him in a professional capacity.

■ The amount misappropriated was at least $2499.64, and likely more because D'Angelo's limited legal work did not warrant a fee of $2779.79. We conclude this fee was excessive in violation of DR 2–106(A) (prohibiting a lawyer from collecting a clearly excessive fee) because D'Angelo did not participate in the California real estate proceeding to obtain a settlement for Roberson and he did not file a bankruptcy petition on Roberson's behalf. He also violated DR 1–102(A)(4) (stating a lawyer shall not engage in dishonesty, fraud, deceit, or misrepresentation) when he billed Roberson for a filing fee for a bankruptcy that was never filed. D'Angelo also violated DR 9–102(B)(4) (failing to promptly pay a client funds they are entitled to receive) when he did not send her the remaining $2449.64 until over three years later when he was directed to do so by the Client Security Commission.

■ It becomes more difficult to attribute misappropriations to sloppiness when client funds repeatedly disappear without explanation. Therefore, based upon his actions in the Roberson matter and the missing $6057.73 in the Eckert matter, we conclude D'Angelo intentionally misappropriated client funds in violation of DR 1–102(A)(3) for illegal conduct involving moral turpitude and DR 1–102(A)(4) for conduct involving dishonesty, fraud, deceit or misrepresentation.

### V. Disposition

■ There is no standard discipline for a particular type of attorney misconduct because "[e]ach case rests on its own facts, viewed in light of the relevant governing considerations." *Iowa Supreme Ct.*

Bd. of Prof'l Ethics & Conduct v. Bernard, 653 N.W.2d 373, 376 (Iowa 2002). "[T]he nature of the alleged violations, the need for deterrence, protection of the public, maintenance of the reputation of the bar as a whole and the respondent's fitness to continue in the practice of law" are all factors that guide our determination. *Comm. on Prof'l Ethics & Conduct v. Blomker*, 379 N.W.2d 19, 21 (Iowa 1985).

When we analyzed the allegations presented against D'Angelo in 2000, we concluded D'Angelo's activities were not fundamentally dishonest because the misappropriations were, with one exception,[4] limited to the taking of unauthorized and premature probate fees. *D'Angelo I*, 619 N.W.2d at 339. We characterized D'Angelo as "inattentive" and "sloppy," but not intentionally dishonest. *Id.* When D'Angelo was before us again in 2002 for similar violations predating his 2002 suspension, we gave him a one year concurrent sentence because "[h]ad these additional matters been brought to our attention at [the time of the first suspension], we seriously doubt that [his] prior suspension ... would have been enlarged." *D'Angelo II*, 652 N.W.2d at 215.

D'Angelo again asks this court for leniency because most of the violations before us today predate his 2000 suspension. He also asks for leniency because, in his opinion, the violations are of the same type for which he has already been punished. We do not agree that the violations are the same, and we do not find leniency is appropriate.

■■■■ "A deliberate conversion of client funds ordinarily demands revocation of the lawyer's license." *D'Angelo I*, 619

N.W.2d at 339; *see Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Anderson*, 687 N.W.2d 587 (Iowa 2004) (revoking license for conversion of entrusted funds); *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Allen*, 586 N.W.2d 383, 389–90 (Iowa 1998) (cataloguing cases where we have revoked an attorney's license for theft of entrusted funds). However, we have recognized other factors which call for leniency. As we stated in our opinion concerning D'Angelo's 2000 suspension, a penalty less than revocation is appropriate when the commingling of funds appears to be negligent, rather than intentional, or when the funds were not knowingly converted to the lawyer's own use, or when no client suffered a financial loss. *D'Angelo I*, 619 N.W.2d at 339. In light of the sheer number of times D'Angelo improperly moved client money from his client trust account to his operating account, we simply cannot conclude the commingling of client funds was negligent, rather than intentional. Similarly, the fact that the funds have vanished, without explanation, to the detriment of numerous clients, leads us to believe these minimizing factors are no longer applicable.

■■■■ This will be the last time we consider D'Angelo's ethical violations. He has misappropriated client funds, practiced law after his license was suspended, neglected his clients, made misrepresentations to the court, and repeatedly failed to cooperate with the Attorney Disciplinary Board. These numerous violations are unacceptable, and we conclude the public will not be protected if D'Angelo is allowed to practice law again. *See Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Leon*, 602

---

4. The one exception was in the estate of Earl Smith, where in a case eerily similar to the Eckert matter now before us, D'Angelo took funds intended for the Iowa inheritance tax, placed them in his firm operating account, and then withdrew the funds without explanation. *D'Angelo I*, 619 N.W.2d at 335.

N.W.2d 336, 339 (Iowa 1999) (stating revocation is necessary to protect the public when there is "a pattern of misconduct [that] leads us to conclude that future misconduct is likely"). We therefore revoke D'Angelo's license to practice law. Costs are assessed to D'Angelo pursuant to Iowa Court Rule 35.25.

LICENSE REVOKED.

All justices concur except LARSON, J., who takes no part.