# IN THE SUPREME COURT OF IOWA

No. 12–1516

Filed May 3, 2013

**IOWA SUPREME COURT ATTORNEY DISCIPLINARY BOARD,**

Complainant,

vs.

**RODNEY HOWARD POWELL,**

Respondent.

On review from the report of the Grievance Commission of the Supreme Court of Iowa.

Grievance commission reports respondent committed ethical misconduct and recommends a public reprimand. **LICENSE SUSPENDED.**

Charles L. Harrington and David J. Grace, Des Moines, for complainant.

Thomas G. Crabb, Des Moines, for respondent.

**CADY, Chief Justice.**

The Iowa Supreme Court Attorney Disciplinary Board charged Rodney H. Powell with multiple violations of the Iowa Rules of Professional Conduct stemming from multiple trust fund infractions. A division of the Grievance Commission of the Supreme Court of Iowa found Powell violated these rules and recommended that he receive a public reprimand. On our review of the commission's report, we find Powell violated the rules of professional conduct. We suspend his license to practice law for a period of three months.

## I. Factual Findings and Prior Proceedings.

Rodney Powell is an Iowa lawyer. He is sixty-six years old. Powell was admitted to the Iowa bar in 1973, following his graduation from law school, but did not begin practicing law in Iowa until 1988. Powell served in the Air Force until 1977 and was employed by a legal services organization in Missouri until he moved to Des Moines in 1988. He practiced with a Des Moines firm after moving to Iowa until he opened his own law firm in 1996. Powell worked mostly as a sole practitioner, but employed associates for a period of time. He was disciplined in 2007 for a variety of unethical actions involved in the collection of fees. He received a private admonition in 2005 for charging an excessive fee and a private admonition in 2010 for failing to make an accounting before withdrawing fees from his trust account.

In 2010, a bookkeeper with Powell's law firm reported to the Board that Powell was improperly using his office trust account. A subsequent audit revealed a trust account shortage. Additional audits also revealed a shortage, and another office bookkeeper made another complaint to the Board.

In response, we temporarily suspended Powell from the practice of law on October 21, 2011, and a trustee was appointed to take control of Powell's trust account. *See* Iowa Ct. R. 35.4. The trustee ultimately determined the account was short approximately $43,000. The Board filed a complaint against Powell on February 28, 2012, alleging Powell violated a variety of trust fund rules, including Iowa Rule of Professional Conduct 32:1.15 (governing the safekeeping of property, including client funds placed in a trust account), as well as Iowa Court Rules 45.1 (imposing requirements for the maintenance of client trust accounts and the deposit of funds), 45.2(2) (maintaining records, providing an accounting, and returning funds), and 45.7 (establishing rules governing advance fees).

On March 21, 2012, Powell filed a petition to lift the temporary suspension. He paid the shortage in his trust account by obtaining a loan and claimed the shortage resulted from sloppy procedures and oversight. Powell also submitted evidence that he had adopted substantial measures to avoid future trust accounting problems. On May 18, 2012, we lifted the temporary suspension order.

The complaint filed by the Board proceeded to a hearing before a division of the grievance commission. The evidence largely supported the allegations of the complaint. From 2007 to 2011, Powell repeatedly deposited client funds in the form of advance fees into the operating account of the firm when the funds should have been deposited in the trust account of the firm. While some of the misdirected funds were the result of a temporary banking process that automatically deposited client funds paid through a credit card into the firm operating account, Powell was extremely slow to correct the problem. In fact, for the most part, he seemed to ignore it. Additionally, some of the mishandled fees were the

result of simple inattention, as well as purposeful actions by Powell. Powell also paid himself numerous legal fees before they were earned and often transferred funds from the trust account into the operating account without notice to the client and without an accompanying accounting of the fee. These actions were frequently taken when Powell needed money for the operating account. Powell compounded his trust fund problem by failing to adequately manage the bookkeeping practices of the firm.

Powell also mishandled nonretainer-client funds. He once wrote a check from his trust account to purchase a bond on behalf of a client after he deposited the client's funds into his operating account. Another time, he used a portion of client funds placed in his trust account for the purpose of paying a property settlement and the attorney fees of opposing counsel pursuant to a stipulated decree for dissolution of marriage to pay his own attorney fees. Powell claimed he did not know the funds were given to him by the client to pay the obligations under the decree. On occasions, Powell's client trust account records showed credits for client funds deposited in his operating account. In short, Powell basically ignored the rules and procedures for maintaining a trust account over a prolonged period of time.

Powell recently implemented corrective measures and now operates his trust account in conformance with the required rules. He maintains confidence in his current staff and has not had problems with his trust account since his reinstatement. No client suffered harm from his actions, and no clients filed a complaint against him for his conduct. Powell is nearing retirement and has performed a significant amount of pro bono legal services for individuals and nonprofit companies over the years.

The commission found Powell violated rule 32:1.15 by failing to segregate trust funds into a separate trust account. It also found Powell violated Iowa Court Rule 45.1 by failing to deposit client funds into his trust account, violated court rule 45.2(2) by failing to maintain complete trust account records and make full accountings,[1] and violated court rule 45.7 by failing to notify clients of the withdrawal of advanced funds. Based largely on the seven-month interim suspension, the Board recommended that Powell receive a public reprimand for his unethical conduct.

## II. Scope of Review.

We review attorney disciplinary proceedings de novo. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Casey*, 761 N.W.2d 53, 55 (Iowa 2009) (per curiam). The Board must prove disciplinary violations by a convincing preponderance of the evidence. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Conrad*, 723 N.W.2d 791, 792 (Iowa 2006). We give respectful consideration to the commission's findings and recommendations, but are not bound by them. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Wheeler*, 824 N.W.2d 505, 509 (Iowa 2012).

## III. Ethical Violations.

We agree with the commission that Powell violated rule 32:1.15, and the Iowa Court Rules governing trust funds. However, the evidence failed to support a finding that Powell had no colorable claim to the funds he removed from his trust account or failed to place in his trust account. Instead, consistent with the charges brought by the Board, he

---

[1]Prior to the date of Powell's hearing, rule 45.2(2) was amended to provide greater guidance to attorneys seeking to comply with trust accounting and record-keeping requirements. *Compare* Iowa R. Prof'l Conduct 45.2(2) (2011), *with* Iowa R. Prof'l Conduct 45.2(2)–(3) (2012). Because Powell's hearing occurred after the amendment of the rule, we evaluate his alleged misconduct in light of subsections (2) and (3) of the current rule. *See* Iowa R. Prof'l Conduct 35.26.

repeatedly failed to comply with the rules and procedures governing trust accounts. The fighting question turns on the sanction that should result from the violations, largely in light of the temporary seven-month suspension served by Powell prior to and during the pendency of this proceeding.

### IV. Sanctions.

While we strive to achieve consistency in the discipline of Iowa lawyers who violate our rules of professional conduct, we also understand that the sanction to result in each individual case must rest on its individual circumstances. *See id.* at 511; *see also Iowa Supreme Ct. Att'y Disciplinary Bd. v. Earley*, 729 N.W.2d 437, 443 (Iowa 2007). In determining the appropriate sanction, we are obligated to

> "consider the nature of the violations, the attorney's fitness to continue in the practice of law, the protection of society from those unfit to practice law, the need to uphold public confidence in the justice system, deterrence, maintenance of the reputation of the bar as a whole, and any aggravating or mitigating circumstances."

*Wheeler*, 824 N.W.2d at 511 (quoting *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Ireland*, 748 N.W.2d 498, 502 (Iowa 2008)).

Broadly, this case involves conduct by a lawyer in improperly removing client funds from a trust account and failing to deposit advance fees into the trust account. Within this broad category of conduct, we recognize that a revocation normally results when the conduct of the offending lawyer constitutes conversion or theft. *See Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Gottschalk*, 553 N.W.2d 322, 325 (Iowa 1996). For example, in *Iowa Supreme Court Attorney Disciplinary Board v. Reilly*, 708 N.W.2d 82, 83, 85 (Iowa 2006), we revoked an attorney's license to practice law, as opposed to imposing a suspension, for converting $99,736.75 from his client trust account, which represented

client proceeds of a settlement claim on behalf of a minor child.[2] We recognized a consistent pattern in our cases over the years of imposing revocation for the conversion of client funds. *Id.* at 84.

Yet, when the case involves client funds held as an advance fee and the conduct of the attorney involves the conversion of the funds before they were earned, we generally impose discipline in the form of a suspension. *See id.* (citing cases imposing a suspension for conduct involving client funds in which the attorney had a colorable future claim or did not take the funds for personal use).

While the conduct in both categories is serious, less serious sanctions are normally appropriate when the offending conduct essentially involves a violation of our rule that fees paid in advance cannot normally be taken by a lawyer before the fee is earned. *Id.* This conduct also often spills into companion trust fund violations governing the notice and accounting requirements that must accompany the withdrawal of trust funds. *See* Iowa Ct. R. 45.7. Thus, we make a distinction for purposes of sanctions between conduct involving trust fund violations and conduct in the nature of stealing.

---

[2]In *Reilly*, the attorney settled a claim of a minor child for $137,500. 708 N.W.2d at 83. He received a settlement draft and deposited it in his firm's trust account. *Id.* Two checks were then written on the trust account to pay the attorney's contingent fee and the law firm's expenses in pursuing the claim. *Id.* The amount that remained in the trust account—$99,736.75—was to be paid to a conservatorship established for the benefit of the minor child. *Id.* Instead, a few weeks later, Reilly withdrew $9000 of the funds held for the child in the trust account by writing two checks on the account. A few weeks later, he withdrew the remaining $90,736.75 by writing one check on the trust account and depositing it in his personal bank account. *Id.* The attorney was a gambling addict that left him in constant need of funds. *Id.* at 85. He had no colorable claim to the funds removed from his trust account after his fees and expenses had been paid. Approximately eight months later, the attorney attempted to make reimbursement to the child by depositing the funds he had removed from the trust account into a conservatorship account managed by an investment firm. *Id.* at 83. However, the transaction was accomplished through a check-kiting scheme that ultimately victimized one of the banks he used to accomplish the scheme. *Id.* The commission recommended a three-year suspension. *Id.* at 82.

The Board brought this case as a trust fund violation, primarily involving the taking of fees before they are earned. Normally, this conduct supports a suspension ranging from a few months to a year or beyond. *See Iowa Supreme Ct. Att'y Disciplinary Bd. v. Parrish*, 801 N.W.2d 580, 588–89 (Iowa 2011) (citing cases); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Isaacson*, 750 N.W.2d 104, 109–10 (Iowa 2008); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. McCann*, 712 N.W.2d 89, 97 (Iowa 2006) (citing cases). The commission believed the seven-month temporary suspension served by Powell in this case supports the imposition of a public reprimand.

Generally, prior discipline is considered to be an aggravating factor in determining the appropriate sanction. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. McCuskey*, 814 N.W.2d 250, 258 (Iowa 2012). However, prior discipline is not an aggravating factor when it is intertwined in the current case. *Id.* Moreover, an interim suspension for conduct involved in a case can be considered as a mitigating factor in determining the length and adequacy of a suspension as a sanction in the case. *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Conroy*, 795 N.W.2d 502, 506–07 (Iowa 2011).

This case has both aggravating and mitigating factors. Powell has committed unethical conduct in the past, but has also freely given his time and professional assistance to nonprofit organizations and low-income individuals in need of legal assistance. Additionally, no client funds were lost in this case, and Powell's trust accounting records and procedures appear to be in good order. We have recognized these factors in mitigation of discipline in the past. *Gottschalk*, 553 N.W.2d at 325.

Considering all the factors and circumstances, we conclude Powell should be suspended for a period of three months. While the interim

seven-month suspension weighs heavily in this case as recognized by the commission, so do the years of utter disregard by Powell for the trust fund rules and practices. Having considered the length and extent of Powell's unethical conduct and his prolonged indifference to the ethical requirements of collecting and maintaining advance fees, the seven-month interim suspension that was imposed in this case to promptly protect the public and straighten out his accounting records is insufficient to meet the goals and purposes of discipline. Powell engaged in conduct that displayed contempt for our rules governing trust accounts and placed client funds at risk. His conduct also diminished the honor and integrity of our profession. The public understandably loses trust in the profession when lawyers fail to properly protect funds required to be held in trust. In the end, an additional period of suspension is needed to uphold public confidence in the justice system and maintain the reputation of the bar. *See Wheeler*, 824 N.W.2d at 511.

## V. Conclusion.

We suspend Powell's license to practice law in this state with no possibility of reinstatement for three months from the date of the filing of this opinion. This suspension shall apply to all facets of the practice of law. Iowa Ct. R. 35.13(3).

Upon application for reinstatement, Powell shall have the burden to show he has not practiced law during the period of suspension and that he meets the requirements of Iowa Court Rule 35.14. The costs of this proceeding are assessed against Powell pursuant to rule 35.27(1).

**LICENSE SUSPENDED.**

All justices concur except Wiggins, J., who dissents.

#12–1516, *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Powell*

**WIGGINS, Justice (dissenting).**

The majority characterizes Powell's misconduct as accounting errors and that any monies Powell used from his trust account were unearned fees. This characterization is contrary to both the commission's findings and the record. Some of the funds in the trust account were not advances for fees he was going to earn in the future. For example, in the representation of Belden, Powell received a credit card payment from Belden's parents totaling $26,000 to cover the retainer fee and bond money for their son's representation. Powell never had a colorable claim to the bond money.

In the Linder matter, Linder provided Powell's associate, Katherine Daman, who was handling his dissolution of marriage case, with the sum of $39,990 for disbursement to Linder's ex-wife. Pursuant to the terms of the property settlement in the dissolution decree, Linder was required to pay his ex-wife's legal fees. Of the $39,990 Powell received to transmit to Linder's ex-wife, Powell only transferred $25,000.

In other words, Powell's alleged accounting errors caused him to use client's money, of which he had no colorable claim, to support his law office. We have previously characterized this conduct as conversion. *See, e.g., Iowa Supreme Ct. Att'y Disciplinary Bd. v. Adams*, 809 N.W.2d 543, 545–46 (Iowa 2012) (revoking the license of an attorney who had no colorable future claim to client funds taken on two occasions); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Wengert*, 790 N.W.2d 94, 102–03 (Iowa 2010) (revoking the license of an attorney who misappropriated client funds and had no colorable claim to the monies); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Earley*, 774 N.W.2d 301, 308–09 (Iowa 2009) (revoking the license of an attorney who had no colorable claim to

$32,500 in client funds that disappeared from the client trust account); *Iowa Supreme Ct. Att'y Disciplinary Bd. v. Reilly*, 708 N.W.2d 82, 84–85 (Iowa 2006) (revoking the license of an attorney who established a check-kiting scheme to misappropriate client funds to which he had no colorable future claim). Therefore, it is improper for the court to adopt a rule distinguishing between conduct involving trust fund violations and conduct characterized as stealing. Our jurisprudence demonstrates that such conduct can be, and often is, one in the same. An attorney can steal just as easily by cooking the books as by directly tapping into a client's bank account. We should not reward with leniency those attorneys who steal by devising evasive accounting practices, while simultaneously imposing the harshest discipline on attorneys who steal client monies through more transparent means. Call it by any other name, but stealing is stealing.

Through electronic fund transfers, Powell automatically deposited these unearned fees and money belonging to clients in the firm's operating account. He did not timely (and in some instances, ever) transfer those monies from the firm's operating account to the trust account. Although funds did not always transfer from the operating account to the trust account, Powell frequently would award a client a trust account balance, which created the illusion that the account contained the advance fee deposit. When a client's advance fee and other funds belonging to a client remained in the firm's operating account, Powell still wrote trust account checks on behalf of that client. The result of this accounting scheme was that eleven to twelve of his clients had negative balances in the trust account. Powell does not dispute this.

Most seriously, Powell's bookkeeper, Leslie Hudson, testified that whenever Powell needed money for the firm's operating account, he

would dip into the trust money. Powell acknowledged in his own testimony that he used the trust account funds, consisting of advance fees and money belonging to the clients, in the operating account to pay firm bills. Moreover, Powell's bookkeeper tried to remedy the problem, but Powell refused to do so. On several occasions, Powell's bookkeeper attempted to have Powell sign a check to transfer the money to the trust account, but Powell made excuses and ultimately did not sign the check.

Another telling sign that Powell was knowingly using client funds for his own use was his response to the various audits conducted by the Client Security Commission. In 2006, the commission audited his accounts and gave him a clean bill of health on his books. This baseline establishes that he knew how to properly handle client funds and not use such monies for his own purposes. After the first audit, the commission found:

> He first came to the attention of the Client Security Commission (Commission) regarding trust account issues in approximately November 2009. Mary Kaye Gooding, his bookkeeper at that time, called the Commission and stated that Powell was not handling his trust account properly.
>
> Successive audits by Commission auditor Allen Davey followed. Davey testified—and Exhibits 1 and 26 substantiate—that as of August 31, 2010, Powell had a shortage of approximately $20,000 in his trust account. An updated audit conducted four months later revealed a $16,000 shortage as of December 31, 2010. A supplemental audit as of August 21, 2011, placed the shortage at approximately $34,778.28.
>
> In mid-2011, Denise Dooley—who was briefly one of Powell's bookkeepers—called the Commission to again report ongoing issues with Powell's trust accounts. That prompted the Office of Professional Regulation to ask the Board to petition the Court and request an interim suspension of Powell under Attorney Discipline, Disability, and Reinstatement Rule 35.4.

. . . .

The Court ordered Fifth Judicial District Chief Judge Arthur E. Gamble to appoint a trustee for Powell's trust account. Judge Gamble appointed practicing attorney, part-time magistrate, and experienced trustee Jeffrey Lipman (Lipman) to take control of the account.

Lipman verified that the amount due and owing to the trust account was now somewhere between $42,000 and $44,000.

(Citations omitted.)

I can believe that accounting errors may have caused the first audit after 2006 to reveal bookkeeping issues. Nevertheless, after the first audit brought these accounting problems to his attention, Powell continued to use client funds for his own personal use. The state of his financial affairs was so bad that his own bookkeeper had to report him, and we temporarily suspended his license. In the end, he used between $42,000 and $44,000 of trust funds for his own use. That means he converted more than $20,000 in client funds for his own purposes, because the first audit already revealed a $20,000 shortfall. I cannot attribute this additional conversion to mere accounting problems.

In the end, the commission made the finding that "Powell indirectly concedes that client money repeatedly went in the firm operating account and was used to pay bills when it should have been deposited into the trust account." The commission also found: "One witness testified that when Powell needed money for the firm's operating account he would transfer the trust money of certain clients. Powell in large corroborated their testimony." This is a clear admission and finding that Powell intentionally converted clients' funds for his own use.

As to the automatic deposit issue regarding credit card charges, the commission made the following finding:

Powell's former employees also testified that when they made Powell aware of the credit card automatic deposit issue, he failed to diligently follow up with the bank to get the problem corrected. In responding to these allegations Powell alternatively claims (1) the bank where the firm's credit card account was set up to not have the technology to credit advance payment to the firm's trust account, and (2) the bank would not get back to him with answers when he contacted it with questions about directing automatic fund deposits.

The Division finds the employee testimony on this allegation more credible than Powell's. Once Powell was aware that the credit card, electronic fund transfers were automatically depositing in the firm operating account instead of in the firm trust account, he was obligated to properly stop the bleeding. He did not and he offers no credible justification for any delay in fixing the problem.

(Citations omitted.)

The logical explanation for his delay in fixing the problem is that he needed the money to operate his law office. As the commission determined, Powell hid all his transgressions from his clients by routinely transferring trust account money "to the firm operating account without notice to the affected client . . . of what fees were earned, when they were earned, and why they were earned." The commission further found that the facts supporting the allegation that Powell converted client funds to pay office expenses "are overwhelming."

Accordingly, on this record, I would agree with the commission's findings and make the factual finding that Powell knowingly converted clients' funds to his own use. Although some of the funds that were converted may have been for advanced fees, some of the money belonged to his clients to pay third parties. His actions constitute theft as defined by the Code, which provides in relevant part:

A person commits theft when the person does any of the following:

. . . .

    2. Misappropriates property which the person has in trust, or property of another which the person has in the person's possession or control, whether such possession or control is lawful or unlawful, by using or disposing of it in a manner which is inconsistent with or a denial of the trust or of the owner's rights in such property, or conceals found property, or appropriates such property to the person's own use, when the owner of such property is known to the person.

Iowa Code § 714.1(2) (2011).

We revoke the license of attorneys who misappropriate funds from their clients. *See, e.g.*, *Adams*, 809 N.W.2d at 546; *Wengert*, 790 N.W.2d at 104; *Earley*, 774 N.W.2d at 308–09; *Iowa Supreme Ct. Att'y Disciplinary Bd. v. D'Angelo*, 710 N.W.2d 226, 236–37 (Iowa 2006); *Reilly*, 708 N.W.2d at 85; *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Anderson*, 687 N.W.2d 587, 590 (Iowa 2004); *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Lett*, 674 N.W.2d 139, 144–45 (Iowa 2004); *Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Leon*, 602 N.W.2d 336, 339 (Iowa 1999).

In one of these cases where we revoked an attorney's license, the attorney, Reilly, withdrew money from the client trust account over a two-month period and used it for his own personal use. *Reilly*, 708 N.W.2d at 83. Months later, Reilly made restitution of the funds, and there was no harm to the client. *Id*. There, we found Reilly violated the same trust account rules as the majority finds Powell did. *Id*. at 84. The commission only recommended a suspension. *Id*. at 82. In response to that recommendation, we reaffirmed our position that we are free to impose a lesser or greater suspension than recommended by the commission. *Id*. at 84. We examined the caselaw and determined misappropriation of a client's funds by itself warrants a revocation of an attorney's license. *Id*. In another recent case, we revoked the license of

an attorney, Adams, who disbursed trust account funds to himself on two occasions, without having a colorable claim to the funds and used those client funds for his own purposes. *Adams*, 809 N.W.2d at 545–46. Yet another example involved an attorney who was holding funds for a client to settle a real estate matter and misappropriated the funds from the trust account to be used in the real estate transaction for her own use. *Lett*, 674 N.W.2d at 142, 144–45.

Powell's conduct in this case is no different from Reilly's, Adams', and Lett's conduct. He used funds in the trust account that clients gave to him to pay third parties. As I previously stated:

> We, as a court and as the regulatory body for our profession, have an obligation to protect the public from dishonest attorneys. I echo the beginning of this dissent—*dishonesty is a trait that disqualifies a person from the practice of law.* A person who uses his law license to steal money or aids another to do so is per se unfit to practice law. Cases like this give the public the perception that a license to practice law is a license to steal.

*Iowa Supreme Ct. Att'y Disciplinary Bd. v. Bieber*, 824 N.W.2d 514, 534 (Iowa 2012) (Wiggins, J., dissenting).

Accordingly, I would revoke Powell's license.