WIGGINS, Justice
(dissenting).
The majority characterizes Powell’s misconduct as accounting errors and that any monies Powell used from his trust account were unearned fees. This characterization is contrary to both the commission’s findings and the record. Some of the funds in the trust account were not advances for fees he was going to earn in the future. For example, in the representation of Bel-den, Powell received a credit card payment from Belden’s parents totaling $26,000 to cover the retainer fee and bond money for their son’s representation. Powell never had a colorable claim to the bond money.
In the Linder matter, Linder provided Powell’s associate, Katherine Daman, who was handling his dissolution of marriage case, with the sum of $39,990 for disbursement to Linder’s ex-wife. Pursuant to the terms of the property settlement in the dissolution decree, Linder was required to pay his ex-wife’s legal fees. Of the $39,990 Powell received to transmit to Linder’s ex-wife, Powell only transferred $25,000.
In other words, Powell’s alleged accounting errors caused him to use client’s money, of which he had no colorable claim, to support his law office. We have previously characterized this conduct as conversion. See, e.g., Iowa Supreme Ct. Att’y Disciplinary Bd. v. Adams, 809 N.W.2d 543, 545-46 (Iowa 2012) (revoking the license of an attorney who had no colorable future claim to client funds taken on two occasions); Iowa Supreme Ct. Att’y Disciplinary Bd. v. Wengert, 790 N.W.2d 94, 102-03 (Iowa 2010)(revoking the license of an attorney who misappropriated client funds and had no colorable claim to the monies); Iowa Supreme Ct. Att’y Disciplinary Bd. v. Earley, 774 N.W.2d 301, 308-09 (Iowa 2009) (revoking the license of an attorney who had no colorable claim to $32,500 in client funds that disappeared from the client trust account); Iowa Supreme Ct. Att’y Disciplinary Bd. v. Reilly, 708 N.W.2d 82, 84-85 (Iowa 2006) (revoking the license of an attorney who established a check-kiting scheme to misappropriate client funds to which he had no colorable future claim). Therefore, it is improper for the court to adopt a rule *361 distinguishing between conduct involving trust fund violations and conduct characterized as stealing. Our jurisprudence demonstrates that such conduct can be, and often is, one in the same. An attorney can steal just as easily by cooking the books as by directly tapping into a client’s bank account. We should not reward with leniency those attorneys who steal by devising evasive accounting practices, while simultaneously imposing the harshest discipline on attorneys who steal client monies through more transparent means. Call it by any other name, but stealing is stealing.
Through electronic fund transfers, Powell automatically deposited these unearned fees and money belonging to clients in the firm’s operating account. He did not timely (and in some instances, ever) transfer those monies from the firm’s operating account to the trust account. Although funds did not always transfer from the operating account to the trust account, Powell frequently would award a client a trust account balance, which created the illusion that the account contained the advance fee deposit. When a client’s advance fee and other funds belonging to a client remained in the firm’s operating account, Powell still wrote trust account checks on behalf of that client. The result of this accounting scheme was that eleven to twelve of his clients had negative balances in the trust account. Powell does not dispute this.
Most seriously, Powell’s bookkeeper, Leslie Hudson, testified that whenever Powell needed money for the firm’s operating account, he would dip into the trust money. Powell acknowledged in his own testimony that he used the trust account funds, consisting of advance fees and money belonging to the clients, in the operating account to pay firm bills. Moreover, Powell’s bookkeeper tried to remedy the problem, but Powell refused to do so. On several occasions, Powell’s bookkeeper attempted to have Powell sign a check to transfer the money to the trust account, but Powell made excuses and ultimately did not sign the check.
Another telling sign that Powell was knowingly using client funds for his own use was his response to the various audits conducted by the Client Security Commission. In 2006, the commission audited his accounts and gave him a clean bill of health on his books. This baseline establishes that he knew how to properly handle client funds and not use such monies for his own purposes. After the first audit, the commission found:
He first came to the attention of the Client Security Commission (Commission) regarding trust account issues in approximately November 2009. Mary Kaye Gooding, his bookkeeper at that time, called the Commission and stated that Powell was not handling his trust account properly.
Successive audits by Commission auditor Allen Davey followed. Davey testified — and Exhibits 1 and 26 substantiate — that as of August 31, 2010, Powell had a shortage of approximately $20,000 in his trust account. An updated audit conducted four months later revealed a $16,000 shortage as of December 31, 2010. A supplemental audit as of August 21, 2011, placed the shortage at approximately $34,778.28.
In mid-2011, Denise Dooley — who was briefly one of Powell’s bookkeepers — called the Commission to again report ongoing issues with Powell’s trust accounts. That prompted the Office of Professional Regulation to ask the Board to petition the Court and request an interim suspension of Powell under Attorney Discipline, Disability, and Reinstatement Rule 35.4.
*362 [[Image here]]
The Court ordered Fifth Judicial District Chief Judge Arthur E. Gamble to appoint a trustee for Powell’s trust account. Judge Gamble appointed practicing attorney, part-time magistrate, and experienced trustee Jeffrey Lipman (Lipman) to take control of the account.
Lipman verified that the amount due and owing to the trust account was now somewhere between $42,000 and $44,000.
(Citations omitted.)
I can believe that accounting errors may have caused the first audit after 2006 to reveal bookkeeping issues. Nevertheless, after the first audit brought these accounting problems to his attention, Powell continued to use client funds for his own personal use. The state of his financial affairs was so bad that his own bookkeeper had to report him, and we temporarily suspended his license. In the end, he used between $42,000 and $44,000 of trust funds for his own use. That means he converted more than $20,000 in client funds for his own purposes, because the first audit already revealed a $20,000 shortfall. I cannot attribute this additional conversion to mere accounting problems.
In the end, the commission made the finding that “Powell indirectly concedes that client money repeatedly went in the firm operating account and was used to pay bills when it should have been deposited into the trust account.” The commission also found: “One witness testified that when Powell needed money for the firm’s operating account he would transfer the trust money of certain clients. Powell in large corroborated their testimony.” This is a clear admission and finding that Powell intentionally converted clients’ funds for his own use.
As to the automatic deposit issue regarding credit card charges, the commission made the following finding:
Powell’s former employees also testified that when they made Powell aware of the credit card automatic deposit issue, he failed to diligently follow up with the bank to get the problem corrected. In responding to these allegations Powell alternatively claims (1) the bank where the firm’s credit card account was set up to not have the technology to credit advance payment to the firm’s trust account, and (2) the bank would not get back to him with answers when he contacted it with questions about directing automatic fund deposits.
The Division finds the employee testimony on this allegation more credible than Powell’s. Once Powell was aware that the credit card, electronic fund transfers were automatically depositing in the firm operating account instead of in the firm trust account, he was obligated to properly stop the bleeding. He did not and he offers no credible justification for any delay in fixing the problem.
(Citations omitted.)
The logical explanation for his delay in fixing the problem is that he needed the money to operate his law office. As the commission determined, Powell hid all his transgressions from his clients by routinely transferring trust account money “to the firm operating account without notice to the affected client ... of what fees were earned, when they were earned, and why they were earned.” The commission further found that the facts supporting the allegation that Powell converted client funds to pay office expenses “are overwhelming.”
Accordingly, on this record, I would agree with the commission’s findings and make the factual finding that Powell know *363 ingly converted clients’ funds to his own use. Although some of the funds that were converted may have been for advanced fees, some of the money belonged to his clients to pay third parties. His actions constitute theft as defined by the Code, which provides in relevant part:
A person commits theft when the person does any of the following:
[[Image here]]
2. Misappropriates property which the person has in trust, or property of another which the person has in the person’s possession or control, whether such possession or control is lawful or unlawful, by using or disposing of it in a manner which is inconsistent with or a denial of the trust or of the owner’s rights in such property, or conceals found property, or appropriates such property to the person’s own use, when the owner of such property is known to the person.
Iowa Code § 714.1(2) (2011).
We revoke the license of attorneys who misappropriate funds from their clients. See, e.g., Adams, 809 N.W.2d at 546; Wengert, 790 N.W.2d at 104; Earley, 774 N.W.2d at 308-09; Iowa Supreme Ct. Att’y Disciplinary Bd. v. D’Angelo, 710 N.W.2d 226, 286-37 (Iowa 2006); Reilly, 708 N.W.2d at 85; Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Anderson, 687 N.W.2d 587, 590 (Iowa 2004); Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Lett, 674 N.W.2d 139, 144-45 (Iowa 2004); Iowa Supreme Ct. Bd. of Prof'l Ethics & Conduct v. Leon, 602 N.W.2d 336, 339 (Iowa 1999).
In one of these cases where we revoked an attorney’s license, the attorney, Reilly, withdrew money from the client trust ac-' count over a two-month period and used it for his own personal use. Reilly, 708 N.W.2d at 83. Months later, Reilly made restitution of the funds, and there was no harm to the client. Id. There, we found Reilly violated the same trust account rules as the majority finds Powell did. Id. at 84. The commission only recommended a suspension. Id. at 82. In response to that recommendation, we reaffirmed our position that we are free to impose a lesser or greater suspension than recommended by the commission. Id. at 84. We examined the caselaw and determined misappropriation of a client’s funds by itself warrants a revocation of an attorney’s license. Id. In anothér recent case, we revoked the license of an attorney, Adams, who disbursed trust account funds to himself on two occasions, without having a colorable claim to the funds and used those client funds for his own purposes. Adams, 809 N.W.2d at 545-46. Yet another example involved an attorney who was holding funds for a client to settle a real estate matter and misappropriated the funds from the trust account to be used in the real estate .transaction for her own use. Lett, 674 N.W.2d at 142, 144-45.
Powell’s conduct in this case is no different from Reilly’s, Adams’, and Lett’s conduct. He used funds in the trust account that clients gave to him to pay third parties. As I previously stated:
We, as a court and as the regulatory body for our profession, have an obligation to protect the public from dishonest attorneys. I echo the beginning of this dissent — dishonesty is a trait that disqualifies a person from the practice of law. A person who uses his law. license to steal money or aids another to do so is per se unfit to practice law. Cases like this give the public the perception that a license to practice law is a license to steal.
Iowa Supreme Ct. Att’y Disciplinary Bd. v. Bieber, 824 N.W.2d 514, 534 (Iowa 2012)(Wiggins, J., dissenting).
*364 Accordingly, I would revoke Powell’s license.